**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )  | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:19-CR-128-JTM-JPK |
| ) | |
| HERMAN L. BANKS, ) | |
| Defendant. ) | |

**FINDINGS, REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE PURSUANT TO**
**28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on referral from District Judge James T. Moody for a report and recommendation on a Motion to Suppress Evidence and Request for Evidentiary Hearing [DE 44], filed by Defendant Herman Banks. As originally filed, the motion sought to suppress both evidence found in a vehicle in which Banks was located (a firearm, ammunition, two magazines, and a holster) when Gary Police responded to a welfare check on September 29, 2019, and certain subsequent statements made by Banks to the investigating officers after Banks' arrest. By Opinion and Order dated March 31, 2021 (ECF No. 55), the District Judge found the statements Banks sought to suppress were voluntary, and therefore denied his request to suppress them. The same Opinion referred the second issue raised by Banks' Motion to Suppress (regarding the evidence located in the vehicle where Banks was found) for this Court to conduct any necessary proceedings and issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Local Rule 72-1, and Federal Rule of Criminal Procedure 59(b)(1). (ECF No. 55, at 46).

Pursuant to this referral, this Court conducted an evidentiary hearing regarding Banks' remaining suppression request on April 19, 2021 (ECF No. 63), after which Banks and the government each submitted supplemental briefing. (ECF Nos. 64-65, 67-68 ). Having considered

the evidence and testimony introduced during the April 19 hearing and the parties' subsequent briefing, this Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). For the following reasons, the Court proposes the findings stated below and recommends that the District Court deny Banks' request to suppress the evidence located in the vehicle where he was found on September 29, 2019, and therefore deny the remainder of Banks' Motion to Suppress.

I. **Proposed Findings of Fact**

   A. **The 911 Call and Dispatch of Gary Police**

Defendant Herman Banks is currently charged with unlawful possession of a weapon and ammunition as a previously convicted felon in violation of 18 U.S.C. § 922(g)(1). (Superseding Indictment, ECF No. 40). The weapon and ammunition were found by Gary police in a vehicle in which Banks was located during the early morning hours of September 29, 2019. (*Id*.). Banks' motion states that he "was sleeping in the driver's seat of his friend's vehicle, with the front passenger window rolled down," prior to the arrival of police that morning. (ECF No. 44, ¶ 3). Banks' post-hearing memorandum also acknowledges that at 5:07 a.m. that day, the Lake County Emergency Dispatch Center received a 911 call reporting someone in a vehicle parked on the 1800 block of Massachusetts Street near the Buzz Box Lounge in Gary, Indiana. (ECF No. 65, at 1; 4/19/21 Transcript ("Tr.") at 8-10). The caller explained that he didn't know "if they were injured or what was wrong with them," but "they had been in a car for about two hours with the lights on." (ECF No. 65, at 1 (quoting Tr. at 12, ECF No. 63)).

It is also undisputed that the emergency dispatcher who took this call (Ms. Lisa Hall) reported it to the Gary Police Department (GPD) through a computerized system known as the "CAD" system through Spillman. (Banks Mem. at 1, ECF No. 65; Tr. at 13-14, ECF No. 63). The

2

emergency dispatcher relayed that the 911 caller reported a man in a vehicle at the foregoing location "for a couple hours," and suggested that GPD "might want to send somebody over there" to do a welfare check. (ECF No. 65, at 1 (quoting Tr. at 13, ECF No. 63); *see also* Tr. at 14-15). At approximately 5:10 a.m. on September 29, 2019, the Lake County dispatcher who received this information (Ms. Drenice Gray) dispatched GPD Sergeant Brock Brinicky to check on the welfare of an individual in a vehicle on Massachusetts Street between 18th and 19th Avenues. (Tr. at 27, 32, 34, ECF No. 63). Although Ms. Gray had no information regarding the make or model of the vehicle, she relayed to Sergeant Brinicky that it was reported to be parked on the 1800 block of Massachusetts Street with the lights on and had been there for about two hours. (*Id*. at 26-27).

### B. Police Welfare Check and Investigation

When Sergeant Brinicky arrived at the scene on the morning of September 29, 2019, he saw a black Lincoln parked facing north on the east side of Massachusetts Street, very near the Buzz Box Lounge located at the intersection of Massachusetts and 18th Avenue. (Tr. at 36, 42, ECF No. 63). The engine was running, the vehicle lights were on, and the driver's window was rolled down, though it was raining at the time. (*Id*.). According to Sergeant Brinicky's testimony at the evidentiary hearing, there was a man in the driver's seat of the vehicle, and he appeared to be passed out because he was slumped over and his eyes were closed. (*Id*. at 37). Sergeant Brinicky, a 20-year veteran of the GPD, also described the neighborhood as a high-crime area where many violent crimes have occurred, with several abandoned and torn-down buildings. (*Id*. at 32, 36). Given the high-crime nature of the neighborhood, the report that the occupant had been in the vehicle for about two hours, and the appearance that he was passed out, Sergeant Brinicky approached the vehicle to determine whether the occupant (Banks) was sick, hurt, or needed medical attention. (*Id*. at 37-38).

3

At the time Sergeant Brinicky approached the vehicle, no other police were at the scene. (Tr. at 37-39, ECF No. 63). According to his testimony, Brinicky announced his presence and attempted to make verbal contact with Banks through the driver's open window in an effort to wake him, but Banks did not respond. (*Id*. at 38-39). Sergeant Brinicky further testified that he then nudged Banks' shoulder through the open window of the vehicle in an effort to rouse him, but Banks did not wake up immediately. (*Id*.). Meanwhile, officer Donald Evans, a twenty-five-year veteran of the GPD who was also dispatched to the same location for a welfare check and backup to Sergeant Brinicky, arrived at the scene. (*Id*. at 64-66, 69, 80). Officer Evans similarly described the neighborhood as a high-crime area involving homicides, shootings, robberies, drug-related crimes, and overdoses. (*Id*. at 67-68, 80, 87). When Evans arrived, Sergeant Brinicky was standing by the vehicle driver's side door, the vehicle was still running with the lights on and the driver's side window down, and Brinicky was attempting to awaken Banks by talking to him though the open window. (*Id*. at 68-69, 106-07). Evans then approached the vehicle to stand alongside Sergeant Brinicky, who continued to try to awaken Banks. (*Id*.).

Precisely when and how Banks was finally awakened is unclear. Sergeant Brinicky testified that Banks finally woke up after Evans arrived and Brinicky nudged Banks a few times through the open car door window, although Banks appeared confused and disoriented and didn't know where he was or what was going on. (*Id*. at 39-41, 46-47, 55). While Evans did not see Brinicky nudge Banks, Evans testified that he did see Brinicky trying to awaken Banks as Evans walked up to the vehicle, and that Banks finally woke up when Brinicky opened the driver's side door. (*Id*. at 69, 104-07, 110). The police report documenting both officers' encounter with Banks (written by officer Evans) also states that Banks woke up as the car door was opened. (*Id*. at 104-05; Def. Ex. 1). Thus, there is some uncertainty as to whether Banks was asleep or awake when Sergeant

4

Brinicky opened the driver's side door of the vehicle. (*See* Govt. Brief at 4, ECF No. 64 ("After nudging Banks a few times and several minutes later, he gained consciousness."); Banks' Mem. at 21, ECF No. 65 ("Sgt Brinicky testified he nudged Banks to wake him up while Officer Evans testified that Banks [woke] up when Brinicky opened the [car] door.")). But the uncertainty as to whether Banks was awakened before or after Brinicky opened the car door appears to be due to the close timing of these two events. As officer Evans testified, "[e]verything happened pretty fast" (Tr. at 83, EF No. 63), and Sergeant Brinicky similarly explained that his efforts to awaken Banks by speaking to him, nudging him, and opening the car door could have happened "simultaneously." (*Id*. at 103). But regardless of whether Banks was awakened beforehand, it is undisputed that Sergeant Brinicky opened the vehicle door, and that neither officer asked Banks' permission before doing so. (*Id*. at 79, 84, 87, 104-07).[1]

Given the uncertainty as to precisely when Banks was awakened, for purposes of the instant motion to suppress, the Court accepts Banks' contention that he was awake when Sergeant Brinicky opened the car door. (ECF No. 65 at 2, 8, 12-13). But the Court also considers the circumstances in which Brinicky found Banks, the difficulty waking him, and his appearance and demeanor once he did wake up. As noted above, Sergeant Brinicky testified that he tried talking to Banks and nudging him several times before Banks finally woke up, and that he was confused and disoriented and didn't know where he was or what was going on when he did. (*Id*. at 39-41). Brinicky also said Banks appeared as though he might have been sick or injured.

---

[1] While Sergeant Brinicky testified that he did not recall who opened the car door, he did not deny doing so. (Tr. at 57, 61, 83, 100, 102-03, ECF No. 63). Similarly, the government's brief takes no position regarding who opened the car door, instead stating that "the driver's door was opened, and Banks exited the vehicle." (ECF No. 64, at 5). Accordingly, since officer Evans testified that Sergeant Brinicky opened the car door and his police report confirmed that the officers opened the car door (*id*. at 79, 84, 87, 104-07; Def. Ex. 1), and neither Sergeant Brinicky nor the government disputes that, this Court's proposed finding is that the officers, and specifically Sergeant Brinicky, did so.

(*Id*.). And while neither officer detected any sign or odor of alcohol or marijuana, Brinicky noted that Banks' eyes were bloodshot, and his appearance combined with the car window being rolled down while it was raining indicated that he was possibly intoxicated. (*Id*. at 41, 52, 55, 84). Moreover, Banks does not dispute that he was confused when he woke up, and instead argues that it is "not unreasonable after immediately being woken up, to wake up a little confused." (ECF No. 65, at 13). It is therefore undisputed that Banks had been asleep in the car for two hours, the engine was running and the car lights were on, the driver's side window was rolled down in the rain, Brinicky had to nudge Banks to wake him up, and Banks appeared confused when he finally did wake up, all before Sergeant Brinicky opened the vehicle door. (*See* Banks' Mem. at 1-2, 5, 12-13, ECF No. 65).

    **C.**    **Evidence Located in the Vehicle**

Once Banks was awake, the officers asked him to identify himself, and Banks presented an Indiana ID card. (Tr. at 40, 50, 59, 81-82, ECF No. 63).[2] The officers also asked Banks what he was doing there, and he responded that he had been to the Buzz Box Lounge. (*Id*. at 85). With the car door open, the officers then told Banks to exit the vehicle, and neither officer told Banks that he was free to remain in the vehicle or leave the scene. (*Id*. at 57, 69, 85, 88, 99). The officers testified that they told Banks to exit the vehicle to determine whether he was sick, injured, or intoxicated and therefore unable to drive, "because we can't let him drive the vehicle down the road if he's not able to drive," and "you can't determine that when he's sitting inside the

---

[2] Although Banks argues he was awake, answered questions, and provided identification "through the open car door window" (ECF No. 65, at 2), the testimony cited for that contention indicates only that Banks was in the vehicle at this time, not that the conversation was through the car door window or before Sergeant Brinicky opened the car door. (Tr. 40, ECF No. 63; *see also id*. at 63). Additionally, officer Evans testified that the officers asked these questions as the car door was opening (*id*. at 106-08), and his police report states that the officers asked Banks to identify himself, and he provided an Indiana ID card, after the car door was open. (Def. Ex. 1).

vehicle." (*Id*. at 40-41, 55-56). Officer Evans also explained there were concerns about Banks' safety if he were to remain in the vehicle with the window rolled down, given the high potential for crime in the surrounding neighborhood. (*Id*. at 87-88).

When Banks complied and exited the vehicle, officer Evans noticed the end of an extended magazine for a firearm protruding from underneath the driver's seat. (*Id*. at 42-43, 70, 102, 111). The government asserts (and Banks does not dispute) that the magazine was in plain view through the open car door. (ECF No. 64, at 11-16; Tr. at 111, ECF No. 63). Sergeant Brinicky then ushered Banks to the rear of the vehicle, and Officer Evans searched the vehicle and located a Glock handgun, second magazine, and holster underneath the driver's seat, in addition to the magazine he originally saw. (Tr. at 43, 71, 73-74, ECF No. 63). Both officers also testified that when these items were recovered, Banks made an utterance about having been to Terre Haute (Federal Correctional Institution) and that he didn't want to go back to prison. (*Id*. at 43-44, 75-76). Officer Evans then checked on Banks' identification to determine whether he had a valid driver's license, any outstanding warrants, and a gun permit. (*Id*. at 52-53, 82-83). While Banks had a valid driver's license and no warrants, the officers determined that he had no gun permit, after which Banks was arrested for possession of a gun without a permit and suspicion of being a convicted felon in possession of a firearm. (*Id*. at 29-30, 44, 52-53, 76, 82). Banks was then transported to the Gary police station at 555 Polk Street, and detained for questioning. (Def. Ex. 1).

    **D.**    **Banks' Statements to Investigators**

Approximately nine hours after Banks' arrest, he was questioned by Alcohol Tobacco and Firearms (ATF) Task Force Officer (TFO) Nate Dillahunty. (Tr. 90, 97, ECF No. 63). After waiving his *Miranda* rights, Banks stated during this interview that he had been to the Buzz Box Lounge the night before, got something to eat, saw some people, had a few drinks, and left when

7

it was closing at 3:00 a.m. (*Id*. at 90, 94-95). Banks also stated that he thereafter "nodded off" in the vehicle, and acknowledged that the vehicle window was down. (*Id*.). According to Banks' statement: "Next thing I know I see some dude pulling a gun out of the car." (*Id*. at 93).

Notably, while Banks' post-hearing brief argues "there is nothing to indicate that Banks was intoxicated or was going to operate his vehicle while intoxicated" at the time it was searched (ECF No. 65, at 17), his Motion to Suppress argued that Banks' subsequent statements to TFO Dillahunty were involuntary because Banks was still "under the influence of alcohol" when he made them, nine hours after his arrest.[3] (ECF No. 44, ¶ 6). As mentioned above, District Judge James T. Moody determined that despite any such intoxication, Banks knowingly and intelligently waived his *Miranda* rights, and his statements to TFO Dillahunty were therefore voluntary. (ECF No. 55, at 4-6). This Court now turns to the additional issue referred by Judge Moody for hearing and a report and recommendation: the proper disposition of the remainder of Banks' motion, to suppress the evidence recovered from the vehicle in which Banks was found. (*Id*. at 1).

## II.   Proposed Conclusions of law

The Fourth Amendment to the Constitution of the United States protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally speaking, a warrant is required prior to any search or seizure. *Katz v. United States*, 389 U.S. 347, 357 (1967) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions")

---

[3] The Court does not consider the statement in Banks' Motion to Suppress when determining whether there was reasonable suspicion for the officers to believe Banks was committing, or about to commit, a violation of Indiana's OWI laws.

(footnotes citing decisions omitted). Here, the government argues that "community caretaking functions" provide an exception to the probable cause and warrant requirements. (*See* Govt. Brief at 8, ECF No. 64 ("a valid exception to the probable cause of the Fourth Amendment requirement is the 'community caretaking' doctrine")).

The government contends that this community caretaking function supported both the responding officer's initial contact with Banks and any police efforts to remove Banks from the vehicle. (ECF. No. 64, at 10). But as the Supreme Court recently noted, case law recognizing "that police officers perform many civic tasks in modern society was just that–a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021). And while there is certainly an "unmistakable distinction between vehicles and homes" when considering law enforcement's conduct under the Fourth Amendment, the touchstone of such analysis is always reasonableness. *Id*. at 1599-1600.

As discussed in more detail below, the undersigned disagrees with the government's contention that the entire encounter between Banks and the police officers, up to the point where a firearm magazine was seen in plain view, is justified by law enforcement's community caretaking role. The question of whether police can approach a vehicle where the engine is running, lights are on, and the sole occupant is asleep in the driver's seat with the window down as it is raining, is not difficult to answer. Checking on such a situation after the report of a concerned citizen is precisely the type of "community caretaking" law enforcement is free, if not obligated, to conduct. In other words, it is entirely reasonable. But the inquiry does not end there. The government seeks to stretch the community caretaker function to include not just the initial police encounter with Banks and their efforts to wake him up, but also when the officers required Banks to exit the vehicle. Yet the testimony of the responding officers did not sufficiently tie this seizure to their

9

community caretaker function.[4] And while the responding officers appeared candid and readily acknowledged when they did not know or remember certain facts, the government bears the burden of demonstrating the legality of the officers' encounter with Banks, and any ambiguity in the facts tips in Banks' favor.

It is also worth noting that there is no recording of the officers' encounter with Banks, and the first officer on the scene (Sergeant Brinicky) delegated the writing of the report to another officer (Evans), who was not present for some of Brinicky's initial encounter with Banks. This all combines to leave some events undocumented and subject to potentially conflicting memories.[5] Ultimately, however, even assuming that the officers were no longer acting within the confines of a community caretaker function when Banks was required to exit the vehicle, the officers' actions were nevertheless lawful if by that time they had reasonable suspicion that Banks was operating a vehicle while intoxicated or about to do so. *See Brissey*, 520 F. Appx 484 ("The question, therefore, is whether at the point that Brissey complied with Hutchins's order to exit the pickup there was a lawful basis to detain him and pat him down."). Thus, given the sequence of events leading up to

---

[4] As explained more fully below, the Court concludes that a seizure occurred when the officers told Banks to exit the vehicle, without informing him that he was free to remain in the vehicle or leave the scene, and Banks complied and exited the vehicle. *See U.S. v. Brissey*, 520 F. Appx 481, 484 (7th Cir. 2013) (seizure occurred when officer "ordered Brissey out of the pickup and Brissey complied," since "both conditions for a seizure were met because [the officer] gave Brissey no choice and Brissey submitted.").

[5] Government and defense counsel each presented their respective evidence in a thorough and persuasive manner, both at the hearing and through briefing. However, as discussed above, the officers' memories, or lack thereof, created some uncertainty as to when and how Banks was finally awakened. (*See supra* at 4-5). For this reason, the Court has accepted Banks' argument that he was awakened before the officers opened his car door, though this fact is ultimately non-dispositive, since the Court concludes (as in *Brissey*) that a seizure occurred afterward, when the officers told Banks to exit the vehicle and Banks complied. *See Brissey*, 520 F. Appx 484; *see also United States v. Long*, 847 F.3d 916, 921 (7th Cir. 2017) (finding no seizure in "officer's instruction" to open car door: "When the officer arrived at the car, he saw Long asleep at the wheel. The officer asked Long to open his door for a purpose totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. That purpose was to ensure that Long was alright. The Constitution allows officers to perform these kinds of caretaking functions because, in doing so, they are taking actions not for any criminal law enforcement purpose but rather to protect members of the public." (quoting *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553-54 (7th Cir. 2014); *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)) (citations, internal quotation marks, and brackets omitted).

Banks exiting his vehicle, it is necessary to proceed chronologically and carefully consider: (1) what police interactions with Banks were permissible pursuant to law enforcement's community caretaker function; and (2) whether law enforcement had reasonable suspicion that criminal activity was afoot before requiring Banks to exit the vehicle.

### A. The Community Caretaker Function and the Initial Encounter Between Banks and Law Enforcement.

Any argument that Banks was seized when police first responded to the calls of a concerned citizen fails for the simple reason that Banks was fast asleep. Among other things, a seizure would require Banks' submission to law enforcement's "assertion of authority." *United States v. Mays*, 819 F.3d 951, 955-56 (7th Cir. 2016) ("A seizure may be effected in either of two ways: 'through physical force or through a show of authority and submission to the assertion of authority.'" (quoting *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011)) (ellipses, brackets omitted)). And Banks plainly did not (and could not) submit to any arguable assertion of authority while he was asleep. The analysis of the initial encounter between Banks and the responding officers could end there. But the parties have addressed the "community caretaker" function of the police, and the Court will do so as well, especially since one must consider whether there was any constitutional violation in the fleeting moments between the time Banks was finally awakened and his removal from the vehicle.

At least in the context of automobiles, the Supreme Court has recognized that "[l]ocal police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441. Unsurprisingly, the Seventh Circuit Court of Appeals has also found no fault with law enforcement approaching

11

vehicles when an occupant is sleeping behind the wheel. *See, e.g.*, *Long*, 847 F.3d at 921 (rejecting argument that a motion to suppress would have merit where an officer approached car and saw defendant asleep behind the wheel); *United States v. Dickson*, 849 F.3d 686, 690 (7th Cir. 2017) (Noting that a responding officer tried "to shake [the defendant] awake only after 'yelling' at him failed to do so, and it is hard to see how [the officer's] actions could be considered unreasonable under the circumstances."); *Brissey*, 520 F. Appx. at 482-84 (no seizure when officer walked up to parked vehicle where driver was asleep and knocked on window, until officer ordered driver out of vehicle and driver complied: "We have repeatedly concluded that a reasonable person would feel free to terminate an encounter when officers approach a citizen sitting in a parked car and ask a few questions, as long as the officers do not flash their weapons, use physical force, use forceful language suggesting that compliance with the officers' request might be compelled, or prevent the citizen from driving away.") (collecting decisions).

Again, the Fourth Amendment protects against only "*unreasonable* searches and seizures." U.S. Const. amend. IV (emphasis added). And the exclusionary rule is meant to deter the culpable conduct of law enforcement. *See, e.g.*, *Davis v. United States*, 564 U.S. 229, 240 ("Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Petitioner's claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" (quoting *Herring v. United States*, 555 U.S. 139, 144 (2009)). There is nothing unreasonable about law enforcement responding to the call of a concerned citizen and checking on the occupant of a vehicle who is asleep behind the wheel of a running vehicle, with a window down while it is raining. We certainly do not want to deter such police conduct.

12

Apart from the clear permissibility of this initial encounter, Banks argues "it was unreasonable for the officers to believe the public need outweighed [his] right to privacy, and as such the action of opening the vehicle door and having [him] exit his vehicle is a Fourth Amendment violation." (ECF No. 65, at 13). While that argument ultimately fails due to the officers' reasonable suspicion that criminal activity was afoot prior to ordering Banks out of the vehicle (an issue addressed in more detail below), the Court agrees with Banks that the government failed to show that his removal from the vehicle was based upon a need to ensure his wellbeing. Although there were many reasons sufficiently anchored to the responding officers' efforts to determine whether Banks was in need of medical assistance that justified opening the car door,[6] the government failed to show that removing Banks from the vehicle also served such a caretaking purpose. Simply put, the government failed to demonstrate how making a potentially ill or injured individual stand up, as opposed to remaining seated, would mitigate any medical issues, instead of making them worse. The officers' exchange with Banks just before requiring him to exit the vehicle – regarding what Banks was doing there, and Banks having been to the Buzz Box Lounge (Tr. at 59-61, 85, ECF No. 63) – also appeared to have an investigative purpose of determining whether he had been operating the vehicle while intoxicated or was about to do so, not any attempt to assess his need for medical assistance. This is not to say that law enforcement exercising solely

---

[6] Contrary to Banks' arguments (ECF No. 65, at 13), the Court disagrees that the responding officer effected a seizure merely by opening Banks' car door. As discussed above, there is no dispute that Banks was sleeping with the car running and the window down while it was raining when the responding officer arrived, that Banks did not respond to verbal attempts to awaken him, that the officer had to nudge Banks multiple times before he finally woke up, and that he was confused when he finally did wake up. (*See supra* at 5-6). The record also shows that Sergeant Brinicky opened the vehicle door within moments of Banks waking up, if not simultaneously. (Tr. at 83, 103, ECF No. 63). Under these circumstances, and given the difficulty the officers had waking Banks, the Court agrees with the government that opening the car door was reasonably related to efforts to determine whether he required medical assistance. *See Long*, 847 F.3d at 921 ("officer's instruction" to open car door was for a purpose "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," specifically, "to ensure that Long was alright" (quoting *Cady*, 413 U.S. at 441)).

a community caretaking function, or even serving both a community caretaking function and more traditional criminal investigative function, may not order an individual out of a car in furtherance of community caretaking concerns. It is simply not clear that is what occurred here.

But that does not end the inquiry; nor does it render the officers' efforts to fulfill their "community Caretaker" functions irrelevant to this case. To use the words of another Court: "The Constitution did not prevent the police from attempting to rouse [Banks] to make sure that he was alright. So the initial investigation - meaning the decision to approach [Banks] and attempt to wake him up - passes muster." *Woods v. Vill. of Bellwood*, No. 19-cv-01214, -- F. Supp. 3d --, 2020 WL 6894660, at *5 (N.D. Ill. Nov. 24, 2020). And of course, as discussed above, much of the initial police encounter was also permissible even in the absence of any community caretaking function, since there was no seizure while Banks was asleep and had not submitted to any arguable assertion of authority. The officers therefore committed no Fourth Amendment violations in their attempts to awaken Banks and determine his wellbeing. The question of whether the officers were constitutionally permitted to remove Banks from the vehicle is a different matter, however, to which we turn next.

### B.    Reasonable Suspicion for OWI

Although the Court agrees with Banks that a seizure occurred when the responding officers required Banks to exit the vehicle, as even Banks acknowledges, this caused no constitutional violation if the officers had "reasonable suspicion that either Banks committed a crime or was about to commit a crime." (*See* Banks' Mem. at 14, ECF No. 65). *See also United States v. Cole*, 994 F.3d 844, 849 (7th Cir. 2021) ("a brief, investigatory stop, may be based on a mere reasonable suspicion, supported by 'specific and articulable facts,' that the subject is engaged in criminal activity" (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *United States v. Ruiz*, 785 F.3d 1134,

1141 (7th Cir. 2015) ("An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime." (quoting *United States v. Uribe*, 709 F.3d 646, 649-50 (7th Cir. 2013)). Such "reasonable suspicion" is "an objective standard, based upon the facts available to the officers at the moment of the seizure." *Ruiz*, 785 F.3d at 1141.

While it is the government's burden to establish reasonable suspicion by a preponderance of the evidence, *Uribe*, 709 F.3d at 650, this "is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Ruiz*, 785 F.3d at 1141 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Thus, reasonable suspicion "can arise from 'behavior that may in other circumstances be considered innocent; in other words, context matters.'" *Id*. (quoting *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014). The Court must therefore examine "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Id*. (quoting *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011)).

Among other things, the government has argued there was reasonable suspicion that Banks had operated a vehicle while intoxicated, which is plainly prohibited under Indiana Code Section 9-30-5-1. (Govt. Brief at 13, ECF No. 64). As Banks argues, however, at least one Indiana court has held there was insufficient evidence to convict an individual of operating a vehicle while intoxicated when they were found sleeping in a parked car. (Banks Mem. at 16, ECF No. 65 (citing *Hiegel v. State*, 538 N.E.2d 265 (Ind. App. 1989)). Rather, Indiana law may require proof that a

15

defendant operated a vehicle "on a highway," which is a "fact-sensitive" issue. *See Winters v. State*, 132 N.E.3d 46, 50 (Ind. App. 2019). It is therefore unclear whether the officers in this case would have been able to demonstrate that Banks was operating a vehicle while intoxicated consistent with these authorities or other Indiana case law. But that is not the question to be answered when determining whether removing Banks from the vehicle was justified by reasonable suspicion of criminal activity. Instead, the Court must determine whether there were "'specific and articulable facts which, taken together with rational inferences from those facts,' suggest criminal activity.'" *Ruiz*, 785 F.3d at 1141 (quoting *Terry*, 392 U.S. at 21).

Cutting against reasonable suspicion, the officers knew from dispatch that the car was reported to have been stationary for some time. Nevertheless, the officers were investigating a "fact sensitive" crime. Was Banks driving intoxicated just before he parked? Did he travel between parking places or on the public roads? The answers to those questions were unknown. And given the relatively low threshold of reasonable suspicion (which is "considerably less than preponderance of the evidence"), the need to investigate a few possible explanations that could conceivably confirm or refute any criminal conduct does not negate reasonable suspicion, given the other facts apparent to the responding officers in this case. *See Ruiz*, 785 F.3d at 1141 (quoting *Bullock*, 632 F.3d at 1012). What is undisputed is that Banks was found asleep behind the wheel of a car that was running, had its lights on, and a window down while it was raining. Additionally, Banks was at the very least slow to wake up, confused when he did wake up, and admitted that he had been to the Buzz Box Lounge earlier. Sleeping in a car with the window down in the rain near a bar, and being disoriented when awakened, plainly suggest possible intoxication; and leaving the engine running with the lights on further suggests that the driver had either been driving or was preparing to. Even if one or more of these facts in isolation would not rise to the level of reasonable

16

suspicion of operating a vehicle while intoxicated, the totality of the circumstances easily exceeds that standard. *See Ruiz*, 785 F.3d at 1141 ("[I]n determining whether officers had the requisite particularized suspicion for a *Terry* stop, we do not consider in isolation each variable of the equation that may add up to reasonable suspicion. Instead, we consider the sum of all of the information known to officers at the time of the stop." (quoting *Matz*, 769 F.3d at 523)).

The scope of the detention employed by the officers also appears reasonably limited. When law enforcement detains an individual based upon reasonable suspicion, the ensuing detention must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *See United States v. Longmire*, 761 F.2d 411, 418 (7th Cir. 1985) ("The Supreme Court has stated that the prosecution bears the burden of establishing 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" (quoting *Florida v. Rover*, 460 U.S. 491, 500 (1983)). In this case, the officers merely required Banks to exit the vehicle; he was not handcuffed or physically restrained, and the officers had no weapons drawn. (Tr. at 42, 70-71, ECF No. 63). And there seems to be no debate that one of the officers saw a firearm magazine in plain sight almost immediately after Banks was removed from the vehicle. (*Id*. at 42, 70, 111). While Banks argues there were less intrusive means to assess his need for medical attention (ECF No. 65 at 13-14), the record demonstrates that this very brief detention while Banks was removed from the vehicle was nevertheless sufficiently tailored to investigate whether he had violated Indiana Code § 9-30-5-1 or was about to do so. This Court therefore concludes that momentarily detaining Banks before officer Evans spotted the extended magazine under the driver's seat was sufficiently limited in scope and duration to assess whether Banks had been or was about to operate a vehicle while intoxicated.

17

## CONCLUSION

For the foregoing reasons, this Court RECOMMENDS that Judge Moody deny Banks' Motion to Suppress [DE 44] regarding the evidence recovered from the vehicle in which he was located by police on September 29, 2019.

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C), Local Rule 72-1, and Federal Rule of Criminal Procedure 59(b)(1). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Report and Recommendation before either the District Court or the Court of Appeals. Fed. R. Crim. P. 59(b)(2); *United States v. Hall*, 462 F.3d 684, 689 (7th Cir. 2006); *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

So ORDERED this 4th day of June, 2021.

> s/ Joshua P. Kolar
> MAGISTRATE JUDGE JOSHUA P. KOLAR
> UNITED STATES DISTRICT COURT